UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IBEW Local 640 Arizona Chapter NECA Pension Trust Fund, on behalf of itself and all others similarly situated,<br><br>       Plaintiff*;*<br><br>  vs.<br><br>BANK OF NOVA SCOTIA, NEW YORK AGENCY; BMO CAPITAL MARKETS CORP.; BNP PARIBAS SECURITIES CORP.; BARCLAYS CAPITAL INC.; CANTOR FITZGERALD & CO.; CITIGROUP GLOBAL MARKETS INC.; CREDIT SUISSE SECURITIES (USA) LLC; DAIWA CAPITAL MARKETS AMERICA INC.; DEUTSCHE BANK SECURITIES INC.; GOLDMAN, SACHS & CO.; HSBC SECURITIES (USA) INC.; JEFFERIES LLC; J.P. MORGAN SECURITIES LLC; MERRILL LYNCH, PIERCE, FENNER & SMITH INCORPORATED; MIZUHO SECURITIES USA INC.; MORGAN STANLEY & CO. LLC; NOMURA SECURITIES INTERNATIONAL, INC.; RBC CAPITAL MARKETS, LLC; RBS SECURITIES INC.; SG AMERICAS SECURITIES, LLC; and UBS SECURITIES LLC,<br><br>       Defendants. | C.A. No.<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**<u>JURY TRIAL DEMANDED</u>** |

## TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................................ 1

II.     JURISDICTION AND VENUE ......................................................................... 4

III.    THE PARTIES.................................................................................................... 5

        A.      Plaintiff ................................................................................................. 5

        B.      Defendants ............................................................................................ 5

IV.     FACTUAL BACKGROUND ............................................................................ 12

        A.      The Market for US Treasuries .............................................................. 12

        B.      US Treasury Department Auctions........................................................ 14

        C.      Participants in US Treasury Department Auctions ................................ 17

        D.      The When-Issued Market...................................................................... 19

        E.      Various Financial Products Are Tied to the Prices of Treasuries........ 20

V.      DEFENDANTS' ILLEGAL CONDUCT .......................................................... 21

        A.      Defendants Collude to Manipulate the Prices of Treasury
                Securities in the When-Issued Market and at US Treasury
                Department Auctions ............................................................................ 21

VI.     CURRENT AND PRIOR GOVERNMENT INVESTIGATIONS  MAKE
        A CONSPIRACY AMONG DEFENDANTS TO  MANIPULATE US
        TREASURIES MARKETS PLAUSIBLE.......................................................... 24

VII.    CERTAIN DEFENDANTS HAVE ADMITTED MANIPULATING
        OTHER ANALOGOUS FINANCIAL MARKETS.......................................... 26

        A.      LIBOR Manipulation............................................................................ 26

        B.      Foreign Exchange Manipulation........................................................... 29

        C.      ISDAFIX Manipulation ....................................................................... 32

VIII.   CLASS ACTION ALLEGATIONS ................................................................. 32

IX.     DEFENDANTS' FRAUDULENTLY CONCEALED THEIR
        MISCONDUCT ................................................................................................ 34

FIRST CLAIM FOR RELIEF  VIOLATION OF 15 U.S.C. § 1 AGREEMENT
          RESTRAINING TRADE ................................................................................. 37

SECOND CLAIM FOR RELIEF  VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.*
          MANIPULATION IN VIOLATION OF THE COMMODITY
          EXCHANGE ACT, INCLUDING CFTC RULE 180.2 .................................... 38

THIRD CLAIM FOR RELIEF  VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.*
          EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR
          CONTRIVANCE IN VIOLATION OF THE COMMODITY
          EXCHANGE ACT, INCLUDING CFTC RULE 180.1 .................................... 39

FOURTH CLAIM FOR RELIEF  VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.*
          PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE
          COMMODITY EXCHANGE ACT ............................................................... 40

FIFTH CLAIM FOR RELIEF  VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.* AIDING
          AND ABETTING LIABILITY IN VIOLATION OF THE COMMODITY
          EXCHANGE ACT ........................................................................................ 41

SIXTH CLAIM FOR RELIEF  UNJUST ENRICHMENT ....................................................... 41

PRAYER FOR RELIEF ............................................................................................ 42

010537-11  797283 V1

Plaintiff, IBEW Local 640 Arizona Chapter NECA Pension Trust Fund, on behalf of itself and all others similarly situated, brings this class action for claims arising under the federal antitrust and commodities laws to recover damages, injunctive relief, and other relief for the substantial injuries it and others similarly situated have sustained as a result of Defendants' unlawful conduct to restrain competition in the market for US Treasury Instruments in the United States from at least as early as January 1, 2007 to December 31, 2012 (the "Class Period").

## I.    INTRODUCTION

1.    LIBOR. Credit Default Swaps.  EURIBOR.  Precious Metals.  ISDAFIX.  Foreign Exchange. These are but a few of the criminal investigations that many of the Defendant financial institutions named in this complaint, have been embroiled in over the last several years relating to the United States' most important financial markets.  Many of the Defendants have already admitted to participating in illegal collusive behavior in these markets, and have collectively agreed to pay billions in fines to the United States Department of Justice.  This case is simply another example of how the defendants rigged the financial markets for their own benefit, and to the detriment of unwitting investors.

2.    This class action concerns Defendants' collusive manipulation of the market for US Treasury T-bills, T-notes, and T-bonds (collectively, "US Treasuries"), and derivative financial products based on US Treasuries, including Treasury futures[1] and options[2] traded on

---

[1]    There are six US Treasury futures traded on the CME: (i) Ultra US Treasury Bond Futures; (ii) Bond Futures; (iii) 10-year Note Futures; (iv) 5-year Note Futures; (v) 3-year Note Futures; and (vi) 2-year Note Futures. For the Ultra U.S. Treasury Bond Futures, Bond Futures, 10-year Note Futures, and 5-year Note Futures, each contract has an underlying unit that is equal to one U.S. Treasury note or bond (depending on the futures contract) having a face value at maturity of $100,000. For the 2-year and 3-year Futures contracts, the underlying unit is one U.S. Treasury note having a face value at maturity of $200,000.  *See* CME Group, THE BASICS OF US TREASURY FUTURES, at 4 (Feb. 2014), available at http:www.cmegroup.com/trading/interest-rates/files/basics-of-us-treasury-futures.pdf.

the Chicago Mercantile Exchange (collectively with US Treasuries, and "US Treasury Instruments").  US Treasuries are debt instruments issued by the US Treasury Department to help finance the operations of the U.S. government. US Treasuries also serve as benchmarks for interest rates and pricing various other assets, including student loan debt, bonds, interest rate swaps, and exchange-traded Treasury futures and options. US Treasury Instruments are used by investors of all sorts for investing and hedging purposes.

3.      Defendants are "primary dealers" in the market for US Treasuries. In this case, Defendants used their special position as primary dealers to subvert the proper operation of the US Treasuries market by colluding to manipulate US Treasury Department auctions, as well as the pricing of US Treasuries in the "when-issued market."[3]

4.      The when-issued market takes place during the seven days leading up to the US Treasury Department auction, and the few days between the auction and the ultimate issuance of the securities. During the pre-auction part of this period, entities including Defendants, pension funds, investment funds, hedge funds, and other types of investors can trade in US Treasuries to be auctioned. Defendants act as sellers of the US Treasuries to their customers in the when-issued market. Then, at auction, Defendants become buyers of the US Treasuries in order to cover the sales they made in the when-issued market. The difference between the price at which Defendants sell in the when-issued market and purchase at auction, or spread, is Defendants' profit.

---

[2] Treasury options include over-the-counter options on a given US Treasuries or options on Treasury futures contracts. Options on Treasury futures contracts are traded on the CME and the underlying security for these options contracts is one Treasury future. OTC options and options on Treasury futures can be written as either "calls" or "puts."

[3] The "when-issued market" is the period between the announcement of a particular auction and the issuance of the US Treasuries that are the subject of the auction.

5.     In a market free from Defendants' manipulation, prices (yields) of US Treasuries generally tend to be higher (lower) in the when-issued market than prices tendered at auction. However, as a result of Defendants' unlawful manipulation of the US Treasuries market, the prices of when-issued US Treasuries were artificially high and the prices of US Treasuries at auction were artificially low. This scheme maximized Defendants' profits at the expense of their customers and others in the market.

6.     As has been reported in the press, Defendants employed a two-pronged scheme to manipulate the US Treasuries market. **First,** Defendants used electronic chatrooms, instant messaging, and other electronic and telephonic methods to exchange confidential customer information, coordinate trading strategies, and increase the bid-ask spread in the when-issued market to *inflate* prices of US Treasuries they sold to the Class. These types of communications were very common among Defendants and were the primary means of communications in other conspiracies Defendants were involved in.[4] **Second,** Defendants used the same means to rig the US Treasury auction bidding process to *deflate* prices at which they bought US Treasuries to cover their pre-auction sales.

7.     By engaging in this unlawful conduct, Defendants maximized the spread not only for transactions in the when-issued market, but also between their buy (auction) price and sell (when-issued) price. This conduct lined the pockets of Defendants while raising prices to investors trading US Treasuries in the when-issued market and investors trading US Treasury Instruments.

---

[4] *See, e.g.*, Catherine Boyle, *Trading scandals: The final nail in chat room's coffins?*, November 11, 2013 on http://www.cnbc.com/2013/11/11/trading-scandals-the-final-nail-in-chatrooms-coffins.html.

8.     Given the tight correlation between US Treasuries prices in the spot market and futures markets, Defendants' manipulation of the auction prices for US Treasuries also directly and proximately caused injury to individuals and entities that traded in US Treasury Instruments.

9.     Recently, it has been confirmed that the U.S. Department of Justice ("DOJ") opened an investigation into the market for US Treasury Instruments. According to press reports, the DOJ has sent requests for information to at least three banks in connection with its probe.

## II.     JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to Sections 4 and 16 of the Clayton Act (15 U.S.C. §§ 15(a) and 26), Section 22 of the Commodity Exchange Act (7 U.S.C. § 25), and pursuant to 28 U.S.C. §§ 1331 and 1337(a).

11.     Venue is proper in this District pursuant to 15 U.S.C. §§ 15(a), 22 and 28 U.S.C. § 1391(b), (c), (d) because during the Class Period all Defendants resided, transacted business, were found, or had agents in this District; a substantial part of the events or omissions giving rise to these claims occurred in this District; and a substantial portion of the affected interstate trade and commerce discussed herein has been carried out in this District.

12.     This Court has personal jurisdiction over each Defendant, because each Defendant: transacted business throughout the United States, including in this District; had substantial contacts with the United States, including in this District; and/or committed overt acts in furtherance of their illegal scheme and conspiracy in the United States. In addition, the conspiracy was directed at, and had the intended effect of, causing injury to persons residing in, located in, or doing business throughout the United States, including in this District, and Plaintiff's claims arise out of Defendants' conduct.

13.     The activities of Defendants and their co-conspirators were within the flow of, were intended to, and did have a substantial effect on the foreign and interstate commerce of the United States.

### III.     THE PARTIES

**A.     Plaintiff**

14.     Plaintiff IBEW Local 640 Arizona Chapter NECA Pension Trust Fund ("Local 640") is a multiemployer Taft-Hartley Pension Trust Fund located in Phoenix, Arizona. Local 640 is jointly administered by labor and management.  The purpose of the Fund is to provide Local 640's members with a retirement benefit to supplement their personal savings, Social Security and other retirement benefits.   Local 640 directly transacted in US Treasury Instruments with one or more of the Defendants. As a direct and proximate result of Defendants' collusive and manipulative activities, Plaintiff was injured in its business or property.

**B.     Defendants**

15.     Defendant Bank of Nova Scotia, New York Agency ("BNS") is a New York-based branch of a Canadian financial services and banking company with its principal place of business at 250 Vesey Street, New York, New York 10080. BNS is a registered primary dealer for US Treasuries with the Federal Reserve ("Federal Reserve").  Defendant BNS colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

16.     Defendant BMO Capital Markets Corp. ("BMO") is a New York-based financial services and banking company with its principal place of business at 3 Times Square, 28th Floor, New York, New York 10036. BMO operates as a subsidiary of BMO Financial Corp. BMO is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant BMO colluded

with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

17.     Defendant BNP Paribas Securities Corp. ("BNPP") is a New York-based financial services company with its principal place of business at 787 Seventh Avenue, New York, New York 10019. BNPP operates as a subsidiary of BNP Paribas North America Inc. BNPP is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant BNPP colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

18.     Defendant Barclays Capital Inc. ("Barclays") is a New York-based financial services company with its principal place of business at 745 Seventh Avenue, New York, New York 10019. Barclays operates as a subsidiary of Barclays Group US, Inc. Barclays is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Barclays colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

19.     Defendant Cantor Fitzgerald & Co. ("Cantor") is a New York-based financial services company with its principal place of business at 499 Park Avenue, New York, New York 10022. Cantor operates as a subsidiary of Cantor Fitzgerald LP. Cantor is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Cantor colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

20.     Defendant Citigroup Global Markets Inc. ("Citigroup") is a New York-based financial services company with its principal place of business at 390-388 Greenwich Street, New York, New York 10013. Citigroup operates as a subsidiary of Citigroup Financial Products

Inc. Citigroup is a registered primary dealer for US Treasuries with the Federal Reserve.

Defendant Citigroup colluded with other defendants named herein, and sold US Treasury

Instruments at artificially inflated prices to members of the class during the Class Period.

21.     Defendant Credit Suisse Securities (USA) LLC ("Credit Suisse") is a New York-

based financial services company with its principal place of business at 11 Madison Avenue,

24th Floor, New York, New York 10010. Credit Suisse operates as a subsidiary of Credit Suisse

(USA), Inc. Credit Suisse is a registered primary dealer for US Treasuries with the Federal

Reserve.  Defendant Credit Suisse colluded with other defendants named herein, and sold US

Treasury Instruments at artificially inflated prices to members of the class during the Class

Period.

22.     Defendant Daiwa Capital Markets America Inc. ("Daiwa") is a New York-based

financial services company with its principal place of business at Financial Square, 32 Old Slip,

New York, New York 10005. Daiwa operates as a subsidiary of Daiwa Capital Markets America

Holdings Inc. Daiwa is a registered primary dealer for US Treasuries with the Federal Reserve.

Defendant Daiwa colluded with other defendants named herein, and sold US Treasury

Instruments at artificially inflated prices to members of the class during the Class Period.

23.     Defendant Deutsche Bank Securities Inc. ("Deutsche Bank") is a New York-

based investment bank with its principal place of business at 60 Wall Street, 4th Floor, New

York, New York 10005. Deutsche Bank operates as a subsidiary of DB U.S. Financial Markets

Holding Corporation. Deutsche Bank is a registered primary dealer for US Treasuries with the

Federal Reserve.  Defendant Deutsche Bank colluded with other defendants named herein, and

sold US Treasury Instruments at artificially inflated prices to members of the class during the

Class Period.

24.     Defendant Goldman, Sachs & Co. ("Goldman") is a New York-based financial services company with its principal place of business at 200 West Street, 29th Floor, New York, New York 10282. Goldman operates as a subsidiary of The Goldman Sachs Group, Inc. Goldman is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Goldman colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

25.     Defendant HSBC Securities (USA) Inc. ("HSBC") is a New York-based investment banking firm with its principal place of business at HSBC Tower, 452 Fifth Avenue, New York, New York 10018. HSBC operates as a subsidiary of HSBC Investments (North America) Inc. HSBC is a registered primary dealer for US Treasuries with the Federal Reserve. Defendant HSBC colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

26.     Defendant Jefferies LLC ("Jefferies") is a New York-based financial services company with its principal place of business at 520 Madison Avenue, 10th Floor, New York, New York 10022. Jefferies operates as a subsidiary of Jefferies Group LLC. Jefferies is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Jefferies colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

27.     Defendant J.P. Morgan Securities LLC ("JPMorgan") is a New York-based financial services company with its principal place of business at 277 Park Avenue, New York, New York 10172. JPMorgan operates as a subsidiary of JPMorgan Chase & Co. JPMorgan is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant JPMorgan

colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

28.     Defendant Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch") is a New York-based financial services company with its principal place of business at One Bryant Park, New York, New York 10036. Merrill Lynch operates as a subsidiary of BAC North America Holding Company. Merrill Lynch is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Merrill Lynch colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

29.     Defendant Mizuho Securities USA Inc. ("Mizuho") is a New York-based financial services company with its principal place of business at 320 Park Avenue, 12th Floor, New York, New York 10022. Mizuho operates as a subsidiary of Mizuho Securities Co., Ltd. Mizuho is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Mizuho colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

30.     Defendant Morgan Stanley & Co. LLC ("Morgan Stanley") is a New York-based financial services company with its principal place of business at 1585 Broadway, New York, New York 10036. Morgan Stanley operates as a subsidiary of Morgan Stanley Domestic Holdings, Inc. Morgan Stanley is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Morgan Stanley colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

31.     Defendant Nomura Securities International, Inc. ("Nomura") is a New York-based financial services company with its principal place of business at 309 West 49th Street, Worldwide Plaza, New York, New York 10019. Nomura operates as a subsidiary of Nomura Holding America, Inc. Nomura is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant Nomura colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

32.     Defendant RBC Capital Markets, LLC ("RBC") is a Canadian financial services company with its principal place of business at Royal Bank Plaza, 200 Bay Street, Toronto, Ontario, Canada ON M5J 2W7. RBC also maintains offices at 3 World Financial Center, 200 Vesey Street, 8th Floor, New York, New York 10281 and at One Liberty Plaza, 165 Broadway, New York, New York 10006. RBC operates as a subsidiary of RBC USA Holdco Corporation. RBC is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant RBC colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

33.     Defendant RBS Securities Inc. ("RBS") is a Connecticut-based financial services company with its principal place of business at 600 Washington Boulevard, Stamford, Connecticut 06901. RBS operates as a subsidiary of RBS Holdings USA Inc. RBS is ,a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant RBS colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

34.     Defendant SG Americas Securities, LLC ("SG") is a New York-based financial services company with its principal place of business at 1221 Avenue of the Americas, 6th Floor,

New York, New York 10020. SG operates as a subsidiary of SG Americas Securities Holdings, LLC, which itself is a subsidiary of Societe Generale Group. SG is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant SG colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

35.     Defendant UBS Securities LLC ("UBS") is a Connecticut-based financial services company with its principal place of business at 677 Washington Boulevard, Stamford, Connecticut 06901. UBS operates as a subsidiary of UBS Americas Inc. UBS is a registered primary dealer for US Treasuries with the Federal Reserve.  Defendant UBS colluded with other defendants named herein, and sold US Treasury Instruments at artificially inflated prices to members of the class during the Class Period.

36.     When reference in this complaint is made to any act or omission of the Defendants, it shall be deemed to mean that the officers, directors, agents, employees, or representatives of the Defendants committed or authorized such act or omission, or failed to adequately supervise or properly control or direct their employees while engaged in the management, direction, operation or control of the affairs of Defendants, and did so while acting within the scope of their employment or agency.

37.     Various persons, partnerships, sole proprietors, firms, corporations, and individuals not named as Defendants in this lawsuit, and individuals, both known and unknown, participated as co-conspirators with Defendants in the offenses alleged in this Complaint, and performed acts and made statements in furtherance of the conspiracy.  Plaintiffs reserve the right to name some or all of these persons and entities as Defendants at a later date.

## IV.  FACTUAL BACKGROUND

### A.  The Market for US Treasuries

38.     The market for US Treasuries is one of the largest and most active debt securities markets in the world with $12.5 trillion of US Treasuries outstanding. Indeed, last year alone, the US Treasury Department issued some $7 trillion in debt instruments with maturities of varying lengths – from a few days to 30 years.

39.     There are three types of US Treasuries:  T-bills, T-notes, and T-bonds. US Treasuries with maturities of one year or less are referred to as *bills* or *T-bills;* securities with maturities of between one and ten years are referred to as *notes* or *T-notes;* and securities with maturities of greater than ten years are called *bonds* or *T-bonds.*

40.     T-bills do not pay interest prior to maturity. Instead, they are sold at a discount to par value. T-notes and T-bonds make coupon payments every six months.

41.     In addition to T-bills, T-notes, and T-bonds, the US Treasury Department also issues more specialized securities, including Treasury Inflation-Protected Securities ("TIPS"), cash management bills ("CMBs"), and Floating Rate Notes ("FRNs"). With TIPS, the principle amount of debt adjusts according to whether there is inflation or deflation, as measured by the Consumer Price Index. Upon maturity, TIPS holders are paid the adjusted principal or the other original principle, whichever is greater. CMBs are occasionally offered by the US Treasury Department to meet short-term financing needs, with their maturities ranging from 1-day to approximately 1-year. However, most are issued with maturities of less than three months.

42.     US Treasuries are used for investing and hedging purposes and as benchmarks for pricing other types of assets. For example, the prices of the following: variable rate bonds; asset-backed securities such as student loan debt; and interest rate swaps are often tied to US

Treasuries. In addition, the yields for US Treasuries are used by many in the public and private sectors to predict the future course of the U.S. and global economy.

43.     T-bills are quoted on a discount basis. An investor's return on a T-bill is the difference between the purchase and subsequent sale price or, when held to maturity, the face value paid by the US Treasury. Consequently, T-bills are quoted at a discount from face value, with the discount expressed as an annual rate based on a 360-day year. For example, a T-bill with a bid (or ask) of "4.00" means that the dealer is willing to buy (or sell) the instrument at an interest rate of 4.00%.

44.     Coupon-bearing T-notes and T-bonds, however, are quoted using slightly different conventions. These US Treasuries are quoted in dollars and fractions of a dollar. The normal fraction used for US Treasuries is 1/32. For example, a bid (or ask) quote of "105.08" means $105 plus 8/32 of a dollar, or $105.25 for each $100 face value of a note (or bond).

45.     The value of T-notes and T-bonds is a function of their par value, the public demand for debt, the coupon, and the yield.

46.     "Par value" means the face value of the note or bond. Usually notes and bonds are sold at a discount of par value. For example, a US Treasury security may have a par value of $1,000, but sells for $100. At maturity, the holder of the US Treasury will receive the par value (*i. e.,* $1,000), plus any accrued interest.

47.     A "coupon" is the interest rate that the issuer of the debt is willing to provide to the holder of the note or bond. Coupons on US Treasuries are usually paid semi-annually *(i.e.,* every six months). The coupon is expressed as a percentage of the par value. For example, if a T-bond pays a coupon of 10% and its par value is $100, then the coupon will pay the bond or note holder $10 in interest every six months (or $20 every year).

**B.**     **US Treasury Department Auctions**

48.     The US Treasury Department issues the vast majority of its debt through public auctions, where participants – including Defendants and other bond broker-dealers, hedge funds, mutual funds, pension funds, and sovereign funds – bid on the auctioned debt. Bidders at US Treasury Department auctions are classified into three primary categories: primary dealers, direct bidders, and indirect bidders.[5]

49.     Treasury auctions are held on a regular basis, and generally follow the following pattern:[6]

---

[5] Michael J. Fleming, *Who Buys Treasury Securities at Auction?*, CURRENT ISSUES IN ECONOMICS & FINANCE, Vol. 13, No. 1 (Jan. 2007), at 2, *available at* http://www.newyorkfed .org/research/current_issues/ci13-l. pdf

[6] Fed. Res. Bank of New York, Treasury Auctions, http://www.newyorkfed.org/aboutthefed/ fedpoint/fed41.html.

| Treasury Security | Time of Offering |
|---|---|
| 4-week bills | Weekly (Tuesdays) |
| 13-week and 26-week bills | Weekly (Mondays) |
| 52-week bills | Every 4 weeks (Tuesdays) |
| 2-year notes | Monthly (End of month) |
| 3-year notes | Monthly (Middle of month) |
| 5-year notes | Monthly (End of month) |
| 7-year notes | Monthly (End of month) |
| 10-year notes | Monthly (Middle of month) |
| 30-year bonds | Monthly (Middle of month) |
| 5-year TIPS | Three times per year (Apr, Aug, Dec) |
| 10-year TIPS | Bimonthly (Jan, Mar, May, Jul, Sep, Nov) |
| 30-year TIPS | Three times per year (Feb, Jun, Oct) |
| 2-year FRN | Monthly (End of month) |

50.     With respect to certain US Treasuries, the US Treasury Department will have "re-openings" in which the US Treasury Department issues additional amounts of a previously issued US Treasuries.

51.     US Treasury Department auctions have three phases: announcement of the auction, bidding, and issuance of the purchased securities. The US Treasury Department typically announces its auctions one week in advance of the auction date. The auctions announcements provide the following details: (1) the amount of the security being offered; (2) the auction date; (3) the date of delivery of the auctioned securities; (4) the maturity date; (4) the terms and conditions of the offering; (5) the noncompetitive and competitive bidding close times; and (6) any other pertinent information.

52.     Participants in these auctions submit their bids through the Treasury Automated Auction Processing System ("TAAPS"). The bids are supposed to be confidential and are considered either "noncompetitive" or "competitive."

53.     Non-competitive bids are generally submitted by small investors and individuals. Non-competitive bidding typically closes at 11:00 a.m. ET for T-bills and 12:00 p.m. ET for T-notes, T-bonds, and TIPS. Non-competitive bidders are guaranteed to receive securities at the auction, but individual non-competitive bidders are limited by federal regulation to $5 million per auction. With a non-competitive bid, a bidder agrees to accept the discount rate (in the case of T-bills) or yield rate (in the case of notes, bonds, and TIPS) determined at auction.

54.     Competitive bids, on the other hand, are usually submitted by large financial institutions for their own accounts or on behalf of customers. Competitive bidding typically closes at 11:30 a.m. ET for T-bills and 1:00 p.m. ET for T-notes, T-bonds, and TIPS. The bids are submitted in terms of a discount rate for T-bills and a yield for coupon-bearing securities, stated in three decimal places. US Treasury Department rules restrict competitive bidders from receiving more than 35 percent of the total amount of securities available to the public. The winning bids are assessed by determining which bidders offered the lowest yields – and thus, the highest prices – on the offered security.

55.     Winning bids are determined by first subtracting the non-competitive bids from the offering amount to determine the amount of US Treasuries available for competitive bidders. Treasuries are then allocated to the competitive bidders based on either the discount rate (in the case of T-bills) or yield rate offered (in the case of T-notes, T-bonds, and TIPS).

56.     Upon completion of an auction, the US Treasury Department publishes limited information about the results of the auction, including: (1) the interest rate; (2) the price; (3) the

highest yield offered; (4) percentage of US Treasuries allotted at the high yield; (5) the median

yield offered; (6) the low yield offered; (7) aggregate figures of bids tendered and accepted at

both competitive and non-competitive auctions; and (8) figures breaking down the bids tendered

and accepted based on bidder type *(e.g.,* primary dealer, direct bidder, and indirect bidder). It

does not identify the specific institutions to whom the securities are allocated or the auction

participants' bids.

57.      Auctioned securities are then delivered to the winning competitive bidders and

non-competitive bidders. Delivery of the auctioned US Treasuries to the winning bidder usually

occurs within a few days after the auction.

**C.      Participants in US Treasury Department Auctions**

58.      There are three categories of participants in US Treasury Department auctions:

primary dealers, direct bidders, and indirect bidders. Primary dealers are institutions that have a

formal trading relationship with the Federal Reserve. There are currently 22 primary dealers, and

each Defendant is designated as one. Primary dealers are usually the most active participants in

the purchase and sale of US Treasuries, and are the only market participants that are required to

bid a specified amount in every US Treasury Department auction.[7] During US Treasury

Department auctions, they are required to bid, at a minimum, no less than their *pro rata* share,

based on the number of primary dealers at the time of the auction – currently, around 4.55% (or

1/22). Primary dealers can bid on their own behalf, which are known as "house bids," as well as

submit bids on behalf of indirect bidders.

---

[7] Fed. Res. Bank of New York, Treasury Auctions, http://www.newyorkfed.org/aboutthe
fed/fedpoint/fed41.html.

59.     Direct bidders also directly bid at US Treasury Department auctions. Historically, their bids are usually for a smaller volume than primary dealers.[8]

60.     Indirect bidders do not submit direct bids to the US Treasury Department; instead, they place their bids through primary dealers and direct bidders.[9] Indirect bidders include pension funds, sovereign wealth funds, and foreign central banks, among others.

61.     Primary dealers comprise the largest participants in Treasury auctions. Primary dealers' allocated shares of particular issuances can vary somewhat depending on the Treasury security offered. One study found that primary dealers' shares for CMBs was 93.1%; 84.7% for 4-week T-bills, 66.3% for 13-week T-bills, and 63.1% for 26-week T-bills.[10]

62.     Under its "Business Standards" for primary dealers, the Federal Reserve states that a primary dealer's "bid rates should be reasonable when compared to the range of rates in the market, taking into account market volatility and other risk factors. In other open market operations, the Federal Reserve will expect a primary dealer to bid, or otherwise participate, in operations at levels commensurate with its size and presence in the market."[11]

63.     By virtue of their ability to bid on behalf of themselves and indirect bidders, primary dealers, unlike other participants in the market, are uniquely situated to see order flows and estimate demand for any given issuance at a US Treasury Department auction.

64.     Representatives from several primary dealers belong to The Treasury Market Practices Group ("TMPG"), a working group of US Treasuries that is sponsored by The Federal

---

[8] Michael J. Fleming, *Who Buys Treasury Securities at Auction?,* CURRENT ISSUES IN ECONOMICS & FINANCE, Vol. 13, No. 1 (Jan. 2007), at 2, *available at* http://www.newyorkfed .org/research/current_issues/ci13-1.pdf.

[9] *Id.*

[10] *Id.* at 3.

[11] Federal Reserve, *Operating Policy: Administration of Relationships with Primary Dealers* (Jan. 11, 2010), http://www.newyorkfed.org/markets/pridealers_policies.html.

Reserve Bank, including: Thomas Wipf of Morgan Stanley; Jim Hraska of Barclays; James DeMare of Merrill Lynch; Mark Tsesarsky of Citigroup; Matt Zames and Sandra O'Connor of JPMorgan; Beth Hammack of Goldman Sachs; and Brian Egnatz of HSBC. These individuals met at various times with representatives of the Federal Reserve and the US Treasury Department to discuss issues in the affecting the Treasury markets.

**D.     The When-Issued Market**

65.     Before a given US Treasury auction, there is an active market for "when-issued" US Treasuries. This when-issued market takes place between the date of announcement of the auction and continues to the date the US Treasury Department issues (delivers) the auctioned securities. In this market, primary dealers and direct bidders execute trades amongst themselves or their customers for the placement of when-issued US Treasuries after the completion of the auction. Defendants' unlawful conduct during the when-issued market took place during the period between the announcement of the auction and the auction.

66.     Despite the fact that the when-issued market begins upon the announcement of a US Treasury Department auction (about seven days prior to the auction), nearly half of all trading occurs within the 48-hour period prior to the auction. A substantial volume of US Treasuries trading occurs during the when-issued market.

67.     In the when-issued market, traders, investors, and dealers place buy and sell orders with each other. If a trader, investor, or dealer takes a short position during the when-issued period, it must be able to cover its short position by obtaining the necessary US Treasuries during the auction or through another source in the secondary market so that it can deliver the US Treasuries to the counterparty going long *(i.e.,* taking delivery the security). The short seller makes money on their short positions if they can obtain US Treasuries from the US Treasury

Department auction (or secondary market) at a lower price than it agreed to sell it at in the when-issued market and deliver to its counterparty going long.

68.     A problem can arise for short sellers when they are unable to cover their short positions with sufficient US Treasuries at a specified price. Under these circumstances, short sellers will be required to pay more for US Treasuries than they otherwise would have liked, narrowing or eliminating entirely their expected profits on the short sale. This phenomenon is known as a "short squeeze." If they happen frequently enough, short squeezes can threaten the integrity and liquidity of the US Treasury market, and make it marginally more difficult for the US Treasury Department to distribute its issuances without disruption. It also may result in driving up the US Treasury Department's borrowing costs as participants withdraw from the market altogether, believing the auction process and when-issued market is rigged.[12]

69.     Given the dynamic of this pre-auction market – namely, the need for short sellers to cover their positions at no loss – primary dealers and others need to obtain their securities at auction at a lower price than they agreed to sell in the when-issued market. Thus, prices for US Treasuries in the when-issued market tend to be higher than prices of US Treasuries sold in the US Treasury Department auctions.

**E.     Various Financial Products Are Tied to the Prices of Treasuries**

70.     There are various products that are tied to the prices of Treasuries, including zero-coupon securities such as Separate Trading of Registered Interest and Principal of Securities ("STRIPS"); corporate and municipal bonds; interest rates on student loans; mortgage rates; and

---

[12] Competitive Impact Statement at 4 n.1, *United States v. Certain Properly Owned by Salomon Bros., Inc.*, *92* Civ. 3700 (S.D.N.Y.), *available at* http://www.justice.gov/atr/cases/f313900/313960.pdf; Dept. of the Treasury, *et al.*, JOINT REPORT ON THE GOVERNMENT SECURITIES MARKET at 10 (Jan. 1992), *available at* http://www.treasury.gov/resource-center/fin-mkts/Documents/gsr92rpt.pdf.

futures and options bought and sold on the CME.  Treasury futures and options are among the most commonly traded instruments that are directly affected by price movements of US Treasuries.

**V.    DEFENDANTS' ILLEGAL CONDUCT**

**A.    Defendants Collude to Manipulate the Prices of Treasury Securities in the When-Issued Market and at US Treasury Department Auctions**

71.    Primary dealers, such as Defendants, in theory, represent dependable partners for the government by ensuring that there will be enough demand for each auction – even to the point of putting up their own funds to purchase US Treasuries at auction – and helping officials to plan by providing insights on market conditions.[13]

72.    For as large and significant as the market for US Treasuries is, surprisingly, there is very little oversight over the US Treasuries market and auction process. Currently, there is a hodgepodge of agencies responsible for overseeing this market.[14]  While the US Treasury Department has the authority to draft rules regarding Treasury security trading, it does not enforce them. Responsibility to enforce these regulations as they apply to cash market generally falls to the Securities and Exchange Commission ("SEC"), and regulation of the trading of Treasury futures and options falls to the Commodity Futures Trading Commission ("CFTC").

---

[13] Christine Harper & Daniel Kruger, *Bond Traders Club Loses Cachet in Most Important Market*, Bloomberg (Apr. 4, 2013), http://www.bloomberg.com/news/articles/2013-04-04/bond-traders-club-loses-cachet-in-most-important-market.

[14] *See, e.g.*, Keri Geiger and Matthew Leising, *Treasuries Collusion Said to Be Hunted in New Wave of Probes*, dated June 10, 2015 in http://www.bloomberg.com/news/articles/2015-06-10/treasuries-collusion-said-to-be-hunted-in-next-wave-of-probes ("Executives from three of the biggest market-making firms in U.S. Treasuries, who asked not to be identified, last year told Bloomberg News that a lack of cohesive regulation and technology to monitor high-frequency traders is making the Treasury market more dangerous for everyone.")

73.     This patchwork of limited oversight and lax enforcement allowed the Defendants to exploit the weakness in the system and employ their collusive and manipulative scheme. [15]

74.     It is an "open secret" that US Treasuries traders employed by Defendants, unlike the average investor, "can see orders flowing in."[16] The information asymmetry between primary dealers and other market participants gives primary dealers a unique informational advantage in both US Treasury Department auctions and the when-issued market, allowing them the ability to assess and anticipate their own exposure and predict price movements in US Treasuries market. More critically, the exchange of this proprietary customer information during the when-issued market, was used by Defendants to artificially inflate prices in the when-issued market through bid-ask spread coordination.

75.     Interviews with traders at primary dealers confirm that they frequently "talked with counterparts at other banks via online chatrooms" and "swapped gossip about clients' Treasury orders."[17] It was this very conduct that enabled Defendants' collusive scheme to flourish.

76.     Similar to what DOJ discovered in connection with its criminal investigation into the FX market, Defendants' employees also used electronic chatrooms and other media to share confidential order flow information and collude on the prices of Treasury security transactions in the when-issued market. Defendants used these same electronic means to collude with respect to

---

[15] JOINT STUDY OF THE REGULATORY SYSTEM FOR GOVERNMENT SECURITIES (Mar. 1998), at 14, *available at* http://www.treasurydirect.gov/instit/statreg/gsareg/gsareg_gsr98rpt.pdf.

[16] Alexandra Scaggs, Daniel Kruger, & Keri Geiger, As U.S. Probes $12.7 Trillion Treasury Market, Trader Talk is a Good place to Start, BLOOMBERG (June 24, 2015) at http://bloom.bg/1TMV51m.

[17] *Id.*

their bidding strategies at US Treasury Department auctions so that they could maximize their gains in auctioned US Treasuries.

77.     Indeed, in response to revelations that FX traders used chatrooms to manipulate the FX market, certain Defendants recently barred their traders from using electronic chatrooms, including Defendants Barclays, Citigroup, Credit Suisse, Deutsche Bank, Goldman Sachs, Morgan Stanley, RBS, and UBS.

78.     Using these electronic methods of communication, Defendants' US Treasuries traders employed a two-pronged scheme to maximize the spread between their short positions in the when-issued market and their acquisition costs of obtaining US Treasuries at US Treasury Department auctions.

79.     First, Defendants' traders agreed to artificially *inflate* the prices of US Treasuries in the when-issued market through coordination of bid-ask spreads. Defendants communicated with each other during the when-issued market to ensure that prices of when-issued US Treasuries would stay at supracompetitive levels.

80.     However, because Defendants are primary dealers – and thus were required to bid at US Treasury Department auctions – Defendants, individually and collectively, generally maintained short positions in the when-issued market. Defendants needed to be able to cover these positions profitably. Thus, they needed to fix the prices at which they bought US Treasuries from the US Treasury Department.

81.     And that's exactly what Defendants did. Defendants coordinated their bidding strategies at the US Treasury Department auctions to artificially *suppress* the prices they would pay for their bids. This had the effect of benefiting the short positions they maintained in the

when-issued market by allowing Defendants to cover their positions with low-cost US Treasuries purchased at auction.

82.     By artificially increasing the spread between prices of US Treasuries in the when-issued market and at auction, Defendants were able reap supracompetitive profits – essentially shorting (selling) US Treasuries artificially high in the when-issued market and then buying them at artificially low prices in the US Treasury Department auction to cover their short positions.

83.     Through Defendants' unlawful conduct, they were able to keep the spread between when-issued and auction prices at supracompetitive levels that would otherwise not have been possible in a competitive market. As shown below, Defendants' conspiracy ultimately collapsed around the time DOJ secured a plea agreement from UBS Securities Japan Co. Ltd. in connection with its investigation of LIBOR in or around December 2012 – a scandal involving similar manipulative conduct that would ultimately engulf several of the same Defendants, their parents, or affiliates.

### VI.    CURRENT AND PRIOR GOVERNMENT INVESTIGATIONS MAKE A CONSPIRACY AMONG DEFENDANTS TO MANIPULATE US TREASURIES MARKETS PLAUSIBLE

84.     Beginning in June 2015, numerous news agencies reported that DOJ requested information from at least three banks regarding their participation in US Treasury Department auctions, and that the investigation is in its early stages.

85.     While DOJ's investigation may be in its early stages, there is recent evidence of Defendants' manipulation of the US Treasuries market. Recently, the CFTC, in connection with its investigation into the manipulation of the ISDAFIX benchmark by many of the Defendants here found that Barclays traders used US Treasuries as part of their manipulative scheme to

move reference rates and spreads that influence ISDAFIX.[18] The CFTC fined Barclays $115 million in connection with its enforcement action for manipulating ISDAFIX.

86.     Further, US Treasuries have been the subject of past manipulation and anticompetitive behavior. In January 1992, the US Treasury Department, the Board of Governors of the Federal Reserve System, and the SEC issued a joint report on operation of the US Treasuries market around and during the auctions.[19] The report found that Salomon Brothers Inc. had submitted bids of questionable propriety during at least five auctions.

87.     Ultimately, DOJ's Antitrust Division filed a complaint alleging that Salomon Brothers and certain unnamed co-conspirators "engaged in a conspiracy to coordinate their trading activity in May 1993 2-year Treasury notes in order to adversely affect prices and rates for the notes in secondary and financing markets."[20] In 1992, Salomon Brothers paid $290 million to settle charges from the SEC and DOJ arising from its conduct in the Treasuries market.

---

[18] *In the Matter of Barclays PLC, et al.*, CFTC Docket No. 15-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 8 n.8 (May 20, 2015) (Barclays traders "at least on a few occasions attempted manipulation through other means, including bidding, offering, and/or executing trades in U.S. Treasuries on [a] Swap Broker's electronic bond trading platform (for 2-year through 30-year maturities)…").

[19] Joint Report on the Government Securities Market (Jan. 1992), *available at* http://www.treasury.gov/resource-center/fin-mkts/Documents/gsr92rpt.pdf.

[20] Dep't of Justice, Press Release, Department of Justice and SEC Enter $290 Million Settlement With Salomon Brothers in Treasury Securities Case (May 20, 1992), http://www.justice.gov/atr/public/press_releases/1992/211182.htm.

## VII.   CERTAIN DEFENDANTS HAVE ADMITTED MANIPULATING OTHER ANALOGOUS FINANCIAL MARKETS

88.     The course of Defendants' conduct in the US Treasuries market is highly reminiscent of the illegal conduct many of the Defendants have already admitted to participating in.

### A.     LIBOR Manipulation

89.     Several Defendants named in this Complaint (or their parents and affiliates) have been implicated in and either admitted guilt or pleaded guilty to wrongdoing in connection with the setting of London Interbank Offered Rate ("LIBOR"). Regulators accused many of these entities of manipulating LIBOR by coordinating submissions and submitting deliberately false quotes for various LIBOR rates to the British Bankers' Association, the organization that collected dealer-bank submissions and calculated the various LIBORs.

90.     On June 22, 2012, Defendant Barclays (and its parent companies, Barclays PLC and Barclays Bank PLC) paid over $450 million in fines to the CFTC ($200 million), DOJ ($160 million), and the U.K. Financial Services Authority ($91 million) in connection with its manipulation of LIBOR and EURIBOR. Barclays admitted to manipulating LIBOR and EURIBOR rates routinely from as early as 2005.

91.     On December 19, 2012, UBS AG and a Japanese subsidiary agreed to pay regulators a total of $1.5 billion in fines for LIBOR rate manipulation. Specifically, UBS AG entered into a non-prosecution agreement with DOJ requiring UBS "to pay an additional $400 million penalty, to admit and accept responsibility for its misconduct as set forth in the extensive

statement of facts and to continue cooperating with the Justice Department in its ongoing investigation."[21]

92.     However, UBS's non-prosecution agreement was later revoked by DOJ, in light of revelations that UBS had also conspired to manipulate FX benchmarks and fix spreads of FX transactions. UBS was obliged under its non-prosecution agreement not to commit any U.S. crimes during the two-year term of the agreement. DOJ determined that UBS breached the non-prosecution agreement because its FX traders engaged in illegal conduct after its execution.

93.     Separately, the CFTC fined UBS $700 million for its role in manipulating LIBOR.

94.     On February 6, 2013, RBS and its wholly-owned subsidiary RBS Securities Japan Ltd. agreed to pay criminal fines of $150 million to DOJ for its role in manipulating LIBOR. RBS Securities Japan Ltd. pleaded guilty to one count of wire fraud and agreed to pay a $50 million criminal fine.

95.     In a deferred prosecution agreement, DOJ charged RBS with one felony count under Section 1 of the Sherman Act for rigging LIBOR rates, as well as another count for wire fraud. According to the deferred prosecution agreement, from approximately 2006 through 2010, certain RBS Yen and Swiss Franc derivatives traders engaged in efforts to move LIBOR in a direction favorable to their trading positions.[22] Through these schemes, RBS defrauded counterparties who were unaware of the manipulation affecting financial products referencing Yen and Swiss Franc LIBOR.[23]

---

[21] Dep't of Justice, Press Release, UBS Securities Japan Co. Ltd. to Plead Guilty to Felony Wire Fraud for Long-running Manipulation of LIBOR Benchmark Interest Rates, Dec. 19, 2012, http://www.justice.gov/opa/pr/2012/December/12-ag-1522.html.

[22] *Id.*

[23] *Id.*

96.     In addition to the criminal fines imposed by DOJ, RBS paid $325 million in fines and disgorgement to the CFTC, and an additional $137 million to the U.K. Financial Services Authority.

97.     In addition, on December 4, 2013, the European Commission fined Barclays, Deutsche Bank, RBS, JPMorgan, and Citigroup approximately $1.7 billion in connection with rigging of various LIBOR rates. Deutsche Bank was fined $633 million; RBS was fined over $500 million; JPMorgan was fined $107 million; and Citigroup was fined $95 million.

98.     More recently, Deutsche Bank entered into a deferred prosecution agreement with DOJ, in which it accepted criminal responsibility for engaging in one count each of wire fraud and price-fixing in violation of the Sherman Act, 15 U.S.C. § 1. DOJ found that Deutsche Bank employees conspired with their counterparts at other banks to submit favorable contributions to LIBOR and EURIBOR. As part of its non-prosecution agreement, Deutsche Bank agreed to pay $625 million in fines.[24]

99.     In connection with DOJ's investigation of Deutsche Bank, a Deutsche Bank subsidiary also pleaded guilty to one count of wire fraud in connection with Deutsche Bank's manipulation of LIBOR and EURIBOR. This subsidiary was assessed a $150 million criminal penalty.[25] Additional penalties were assessed by the CFTC ($800 million); New York Department of Financial Services ($600 million); and the U.K. Financial Conduct Authority ($344 million).

---

[24] Dep't of Justice, Press Release, Deutsche Bank's London Subsidiary Agrees to Plead Guilty in Connection with Long-Running Manipulation of LIBOR (Apr. 23, 2015), http://www.justice.gov/opa/pr/deutsche-banks-london-subsidiary-agrees-plead-guilty-connection-long-running-manipulation.

[25] Plea Agreement at ¶ 17, *United States v. DB Group Srvs. UK Limited*, *available at* http://www.justice.gov/sites/default/files/opa/press-releases/attachments/2015/04/23/dbgs_plea_agreement.pdf.

**B.      Foreign Exchange Manipulation**

100.     Barclays, HSBC, UBS, Citigroup, JPMorgan, and RBS entities were recently subjected to multiple investigations that resulted in substantial fines stemming from their conspiracy to manipulate FX benchmarks – including the WM/Reuters ("WMR") rates and European Central Bank ("ECB") rates – as well as to fix the bid-ask spreads on FX transactions. Among the conduct these banks have admitted to perpetrating, include: disclosing confidential customer order information and trading positions; adjusting trading positions to accommodate the interests of the collective group; trading to trigger customers' limit orders or customers' barrier options for the bank's benefit and to the detriment of those customers; agreeing to enter into trading strategies to manipulate benchmark prices; and agreeing to fix the spreads on customer FX transactions.

101.     On May 20, 2015, Citicorp, JPMorgan Chase & Co., Barclays PLC, and The Royal Bank of Scotland plc, pleaded guilty to conspiring to manipulate the price of the U.S. dollar and euro currency pair exchanged in the FX spot market. Specifically, these banks entered into and engaged in a "conspiracy to fix, stabilize, maintain, increase or decrease the price of and rig bids and offers for the euro/U.S. dollar currency pair exchanged in the foreign currency spot market, which began at least as early as December 2007 and continued until at least January 2013, by agreeing to eliminate competition in the purchase and the sale of the U.S. dollar and euro currency pair in the United States and elsewhere, in violation of the Sherman Antitrust Act, 15 U.S.C. § 1."[26]

---

[26] *See, e.g.*, DOJ Barclays Plea Agreement at ¶ 2.

102.    The banks agreed to pay criminal fines totaling more than $2.5 billion. Citicorp

agreed to pay a fine of $925 million.[27] Barclays agreed to pay a fine of $650 million.[28] JPMorgan

agreed to pay a fine of $550 million.[29] RBS agreed to pay a fine of $395 million.[30]

103.    Also, on May 20, 2015, UBS pleaded guilty to manipulating LIBOR and other

benchmark interest rates and paid a $230 million criminal penalty.[31] According to the factual

statement attached to UBS's plea agreement, DOJ found that UBS engaged in deceptive FX

trading and sales practices after it signed the LIBOR non-prosecution agreement. UBS admitted

that it conspired with other firms acting as dealers in an FX spot market by "agreeing to restrain

competition in the purchase and sale of the EUR/USD currency pair in the United States and

elsewhere . . . by, among other things: (i) coordinating the trading of the EUR/USD currency pair

in connection with ECB and WMR benchmark currency 'fixes' . . ., and (ii) refraining from

certain trading behavior, by withholding bids and offers, when one conspirator held an open risk

position, so that the price of the currency traded would not move in a direction adverse to the

conspirator with an open risk position."[32] Additionally, UBS traders tracked and executed limit

[27] DOJ Citigroup Plea Agreement, May 20, 2015 (available at: http://www.justice.gov/file
/440486/download)

[28] DOJ Barclays Plea Agreement, May 20, 2015 (available at: http://www.justice.gov/file
/440481/download).

[29] DOJ JPMorgan Plea Agreement, May 20, 2015 (available at: http://www.justice.gov/file
/440491/download).

[30] DOJ RBS Plea Agreement, May 20, 2015 (available at: http://www.justice.gov/file
/440496/download).

[31] DOJ UBS Plea Agreement, May 20, 2015 (available at: http://www.justice.gov/file/440521
/download).

[32] *Id.*

orders at a level different from the customer's specified level in order to add undisclosed markups.[33]

104.     In connection with its parallel investigation into the FX market, the CFTC found that Citibank, JPMorgan, HSBC, RBS, UBS, and Barclays "failed to adequately assess the risks associated with their FX traders participating in the fixing of certain FX benchmark rates and lacked adequate internal controls in order to prevent improper communications by traders."[34] These banks "lacked sufficient policies, procedures and training specifically governing participation in trading around the FX benchmarks rates; and had inadequate policies pertaining to, or sufficient oversight of, their FX traders' use of chat rooms or other electronic messaging."[35]

105.     The CFTC Orders also noted that between August 2012 and December 2013, Citibank, JPMorgan, HSBC, RBS, LTBS, and Barclays either banned or restricted the use of multi-bank chat rooms for its FX personnel.[36]

---

[33] *Id*. at ¶ 14.

[34] *See CFTC Orders Five Banks to Pay over* $1.4 *Billion in Penalties for Attempted Manipulation of Foreign Exchange Benchmark Rates*, Release PR 7056-14 (Nov. 12, 2014) (available, with links to Consent Orders, at http://www.cftc.gov/PressRoom/Press Releases/pr7056-14); *see also* Barclays to Pay $400 Million Penalty to Settle CFTC Charges of Attempted Manipulation and False Reporting of Foreign Exchange Benchmarks (May 20, 2015) (available at www.cftc.gov/PressRoom/ PressRelease/pr7181-15).

[35] *Id.*

[36] *In the Matter of Citibank, N. A.*, CFTC Docket No. 15-03, Order Instituting Proceeding Pursuant to Sections 6(c)(4)(A) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 9 (Nov. 11, 2014) (early 2013); *In the Matter of JPMorgan Chase Bank, N.A.*, CFTC Dkt. No. 15-04 (Nov. 11, 2014) at 8 (December 2013); *In the Matter of HSBC Bank plc*, CFTC Dkt. No. 15-07 (Nov. 11, 2014) at 10 (December 2012); *In the Matter of Royal Bank of Scotland plc*, CFTC Dkt. No. 15-05(Nov. 11, 2014) at 7 (August 2012); *In the Matter of UBS AG*, CFTC Dkt. No. 15-06 (Nov. 11, 2014) at 8 (November 2013); New York State Department of Financial Services, *In the Matter of Barclays Bank plc*, Consent Order Under New York Banking Law § 34, at 9 (May 20, 2015) (available at: http://www.dfs.ny. gov/about/ea/ea150520.pdf).

C.      ISDAFIX Manipulation

106.    On May 20, 2015, the CFTC fined Defendant Barclays (and its parent companies, Barclays PLC and Barclays Bank PLC) $115 million for manipulating a widely used interest rate derivatives benchmark known as ISDAFIX. The CFTC found that certain Barclays traders "bid, offered, and executed transactions in targeted interest rate products, including swap spreads, at the critical 11:00 a.m. fixing time with the intent to affect the reference rates and spreads . . . and thereby to affect the published USD ISDAFIX."[37]

107.    The CFTC further found that "certain traders at Barclays attempted to manipulate USD ISDAFIX by making false submissions for Barclays as a panel bank . . . skewing the rates and spreads submitted in the direction that could have moved USD ISDAFIX setting to benefit the Bank's trading positions."[38]

### VIII.   CLASS ACTION ALLEGATIONS

108.    Plaintiff brings this action on behalf of itself and as a class action under Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, seeking relief on behalf of the following class (the "Class"):

> All persons or entities who during the period from January 1, 2007 through December 31, 2012 (the "Class Period") transacted in any Treasury Instrument.  Excluded from the Class are Defendants and their employees, affiliates, parents, subsidiaries, and co-conspirators, whether or not named in this Complaint, and the United States Government.

109.    Plaintiff believes that there are thousands of Class Members, making the Class so numerous and geographically dispersed that joinder of all Class Members is impracticable.

---

[37] *In the Matter of Barclays PLC, et al.*, CFTC Docket No. 15-25, Order Instituting Proceedings Pursuant to Sections 6(c) and 6(d) of the Commodity Exchange Act, Making Findings, and Imposing Remedial Sanctions, at 3 (May 20, 2015).

[38] *Id.*

110.    There are questions of law and fact common to the Class that relate to the existence of the conspiracy alleged, and the type and common pattern of injury sustained as a result thereof, including, but not limited to:

a.   Whether Defendants and their co-conspirators engaged in a combination or conspiracy to fix, raise, maintain, stabilize and/or otherwise manipulate the prices for Treasury Instruments in violation of the Sherman Act and/or Commodity Exchange Act;

b.   The identity of the participants in the conspiracy;

c.   The duration of the conspiracy;

d.   The nature and character of the acts performed by Defendants and their coconspirators in furtherance of the conspiracy;

e.   Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of Plaintiff and the Class Members;

f.   Whether Defendants and their co-conspirators fraudulently concealed the conspiracy's existence from Plaintiff and the Class Members;

g.   The appropriate injunctive and equitable relief for the Class; and the appropriate measure of damages sustained by Plaintiff and the Class Members.

111.    Plaintiff's claims are typical of the claims of the other Class Members. Plaintiff and Class Members sustained damages arising out of Defendants' common course of conduct in violation of law as complained of herein. The injuries and damages of each Class Member were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein.

112.    Plaintiff will fairly and adequately protect the interests of Class Members. Plaintiff is an adequate representative of the Class and has no interests adverse to the interests of absent Class Members. Plaintiff has retained counsel competent and experienced in class action litigation, including antitrust and commodities class action litigation.

113.    The prosecution of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications.

114.    The questions of law and fact common to the Class Members predominate over any questions affecting only individual members, including legal and factual issues relating to liability and damages.

115.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently and without duplication of effort and expense that numerous, separate individual actions, or repetitive litigation, would entail. The Class is readily definable and is one for which records should exist in the files of Defendants and their co-conspirators, Class Members, or the public record. Class treatment will also permit the adjudication of relatively small claims by many Class Members who otherwise could not afford to litigate the claims alleged herein, including those for antitrust. This class action presents no difficulties of management that would preclude its maintenance as a class action.

## IX.    DEFENDANTS' FRAUDULENTLY CONCEALED THEIR MISCONDUCT

116.    Defendants and their co-conspirators concealed their wrongdoing in manipulating the prices of US Treasuries in the when-issued market and at the US Treasury Department auctions. Thus, the statutes of limitations relating to the claims for relief alleged below were tolled due both to Defendants' and their co-conspirators affirmative acts of concealment and the inherently self-concealing nature of their private, unregulated conduct.

117.    Defendants' and their co-conspirators' success in concealing their collusion was facilitated by their tremendous control over the market for US Treasuries by virtue of their positions as primary dealers in this market.

118.     Neither Plaintiff nor Class Members knew of Defendants' and their co-conspirators' unlawful and self-concealing manipulative acts and could not have discovered them by the exercise of reasonable due diligence, if at all, at least prior to public reports disclosing DOJ's investigation of the US Treasuries market. Plaintiff and the Class also lacked any basis for identifying the wrongdoers or calculating damages before that date. Indeed, Defendants' and their co-conspirators' conduct concerning their manipulation was so well hidden that Defendants and their co-conspirators kept U.S. regulators unaware of such conduct for years.

119.     Only after recent public reports disclosed DOJ's investigation of the US Treasuries market, in or around June 2015, did Plaintiff have a sufficient basis to investigate possible manipulation of the US Treasuries market by Defendants and their co-conspirators.

120.     Reasonable due diligence could not have uncovered Defendants' and their co-conspirators' manipulative conspiracy because: (i) the US Treasury Department auctions were held out as being set by an impartial auction based on market factors; (ii) Defendants' bids in the US Treasury Department auctions are secret and not publicly available; (iii) Defendants' and their co-conspirators' trading positions and trading strategies in the when-issued market are not publicly available; (iv) the bilateral, non-exchange traded nature of when-issued market transactions make observing anticompetitive and/or manipulative behavior in that market exceedingly difficult; (v) the highly specialized and esoteric nature of the different aspects of the US Treasuries market makes it extraordinarily difficult for an ordinary person to assess improprieties; and (vi) neither Defendants nor their co-conspirators told Plaintiff or other Class Members that they were conspiring to fix, stabilize, maintain, and/or otherwise manipulate the prices of US Treasuries during the when-issued market or at the auctions.

121.    Defendants and their co-conspirators also took active steps to conceal evidence of their misconduct from Plaintiff, the Class, regulators, and the public including, among other things: (i) holding out their activities in the when-issued market and at auction as good faith market-making conduct; (ii) maintaining the secrecy of their price-fixing scheme; (iii) avoiding any discussion in public fora of their collusive activities and manipulation of the when-issued market and US Treasury Department auctions; and (iv) using non-public proprietary electronic communication platforms *(e.g.,* instant messaging, electronic chatrooms, etc.) to coordinate trading strategies in the when-issued market and auction behavior.

122.    In addition, Defendants and their co-conspirators also failed to have the proper internal controls in place to detect misconduct concerning the manipulation of US Treasuries. Such internal failures made it all the more difficult for Plaintiff, the Class, government regulators, and the public to become aware of Defendants' and their co-conspirators misconduct.

123.    As a result of Defendants' and their co-conspirators' affirmative steps to conceal their improper conduct; their willful decision not to put in place proper controls to detect improper conduct; the self-concealing nature of the price-fixing conspiracy; and the resulting lack of public information about material aspects of the conspiracy, collusion, and trading based on nonpublic information, the statutes of limitations was tolled for Plaintiff's claims.

**FIRST CLAIM FOR RELIEF**

**VIOLATION OF 15 U.S.C. § 1**
**AGREEMENT RESTRAINING TRADE**

124.    Plaintiff hereby incorporates each preceding and succeeding paragraph as though fully set forth herein.

125.    Defendants and their unnamed co-conspirators entered into and engaged in a combination and conspiracy that was an unreasonable and unlawful restraint of trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, *et seq.*

126.    During the Class Period, Defendants entered into an agreement to reduce competition amongst themselves by fixing and/or manipulating prices of US Treasuries before and during Treasury auctions and, as a result, the prices of US Treasury Instruments were artificially inflated.

127.    This conspiracy to manipulate prices of US Treasuries and the benchmark price caused injury to both Plaintiff and the Class by depriving them of the benefit of accurate US Treasuries prices reflecting true market conditions for some period during and following Defendants' unlawful conduct, and thus Plaintiff and the Class received, upon execution of their trades, less in value than they would have received absent Defendants' wrongful conduct.

128.    The conspiracy is a *per se* violation of Section 1 of the Sherman Act. Alternatively, the conspiracy resulted in substantial anticompetitive effects in the US Treasuries markets. There is no legitimate business justification for, or pro-competitive benefits from, Defendants' conduct, Furthermore, any business justification is outweighed by the anticompetitive effects of Defendants' conduct.

129.    As a direct and proximate result of Defendants' violation of Section 1 of the Sherman Act, Plaintiff and the Class have been injured in their business and property throughout the Class Period.

130.    Plaintiff and the Class are entitled to treble damages for the violations of the Sherman Act alleged herein. Plaintiff and the Class are also entitled to injunctive and other equitable relief, pursuant to 15 U.S.C. § 26.

**SECOND CLAIM FOR RELIEF**

**VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.***
**MANIPULATION IN VIOLATION OF THE COMMODITY EXCHANGE ACT,**
**INCLUDING CFTC RULE 180.2**

131.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

132.    By their intentional misconduct, Defendants and their co-conspirators each violated Sections 6(c)(3) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§ 9(3), 13(a)(2), and CFTC Rule 180.2 adopted under the CEA ("Rule 180.2") and caused prices of exchange-traded US Treasury Instruments to be artificial during the Class Period.

133.    Defendants' and their co-conspirators' trading and other activities alleged herein constitute market power manipulation of the prices of exchange-traded US Treasury Instruments and in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.2.

134.    Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

135.    Plaintiff and others who transacted in exchange-traded US Treasury Instruments during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulation in violation of the CEA, 7 U.S.C. § 1, *et seq.,* and Rule 180.2,

and as a direct result thereof were injured and suffered damages. Plaintiff and each member of

the Class sustained and are entitled to actual damages for the violations of the CEA alleged

herein.

### THIRD CLAIM FOR RELIEF

### VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.* EMPLOYMENT OF MANIPULATIVE OR DECEPTIVE DEVICE OR CONTRIVANCE IN VIOLATION OF THE COMMODITY EXCHANGE ACT, INCLUDING CFTC RULE 180.1

136.    Plaintiff incorporates by reference and re-alleges the preceding allegations as

though fully set forth herein.

137.    By their intentional misconduct, Defendants and their co-conspirators each

violated Sections 6(c)(1) and 9(a)(2) of the Commodity Exchange Act (the "CEA"), 7 U.S.C. §§

9(1), 13(a)(2), and CFTC Rule 180.1 adopted under the CEA ("Rule 180.1") and caused prices

of exchange-traded US Treasury Instruments to be artificially inflated during the Class Period.

138.    Defendants' and their co-conspirators' trading and other activities alleged herein

constitute market power manipulation of the prices of exchange-traded US Treasury Instruments

in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a), and Rule 180.1.

139.    In violation of CEA Section 6(c)(1), and CFTC Rule 180.1, Defendants and co-

conspirators also caused to be delivered for transmission false or misleading or inaccurate reports

in connection with the US Treasury Department auctions by fixing the bids during these

auctions, thereby causing them to reflect artificial, non-competitive pricing for these securities.

Defendants and co-conspirators did so either knowingly, intentionally, or acting in reckless

disregard of the fact that such reports were false, misleading or inaccurate. Defendants also

violated CFTC Rule 180.1 by deceiving their customers in the when-issued market through the

sale of price-fixed when-issued US Treasuries. Customers in the when-issued market had a

reasonable expectation that the prices of when-issued US Treasuries are reflective of natural

market forces. By selling price-fixed US Treasuries to their unwitting customers, Defendants undermined their customers' reasonable expectations of a fair marketplace free from manipulation and collusion.

140.    Defendants' and their co-conspirators' manipulation deprived Plaintiff and the Class of a lawfully operating market during the Class Period.

141.    Plaintiff and others who transacted in exchange-traded US Treasury Instruments during the Class Period transacted at artificial and unlawful prices resulting from Defendants' and co-conspirators' manipulations in violation of the CEA, 7 U.S.C. § 1, *et seq.,* and Rule 180.1, and as a direct result thereof were injured and suffered damages. Plaintiff and each member of the Class sustained and are entitled to actual damages for the violations of the CEA alleged herein.

## FOURTH CLAIM FOR RELIEF

### VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.*
### PRINCIPAL-AGENT LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

142.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

143.    Each Defendant is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

144.    Plaintiff and each member of the Class are entitled to actual damages for the violations of the CEA alleged herein.

## FIFTH CLAIM FOR RELIEF

## VIOLATION OF 7 U.S.C. §§ 1 *ET SEQ.*
## AIDING AND ABETTING LIABILITY IN VIOLATION OF THE COMMODITY EXCHANGE ACT

145.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

146.    Defendants and their co-conspirators knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each other's, and their co-conspirators' manipulation of the Treasuries market, and willfully intended to assist these manipulations, which resulted in Treasury futures and options pricing becoming artificial during the Class Period in violation of Sections 13 and 22(a)(1) of the CEA, 7 U.S.C. §§ 13c(a), 25(a)(1).

147.    Plaintiff and each member of the Class are entitled to actual damages for the violations of the CEA alleged herein.

## SIXTH CLAIM FOR RELIEF

### UNJUST ENRICHMENT

148.    Plaintiff incorporates by reference and re-alleges the preceding allegations as though fully set forth herein.

149.    Because of the acts of Defendants and their co-conspirators as alleged herein, Defendants have been unjustly enriched at the expense of Plaintiff and the Class.

150.    It would violate established principles of equity and good conscience for Defendants to keep their ill-gotten profits from their manipulation of the Treasuries market and the US Treasuries and exchange-traded Treasury futures and options that were directly tied to them.

151.    Plaintiff and Class Members transacted in US Treasuries directly with Defendants in the when-issued market. By virtue of Defendants' manipulation of these when-issued US Treasuries, Plaintiff and Class Members were deprived the benefits of a fair market, free from collusion and manipulation. Defendants reaped millions of dollar in profits at the expense of Plaintiff and members of the Class as result of their misconduct.

152.    Furthermore, the Treasury derivatives market, which includes Treasury futures and options, are effectively a zero-sum game, meaning that when one individual gains money in a particular transaction, another must lose money on that same transaction. As a direct and foreseeable consequence of Defendants' manipulation of the Treasuries market, Defendants were able reap millions of dollars in profits at the expense of Plaintiff and members of the Class, who sold US Treasuries, including Treasury futures and options traded on the CME.

153.    Accordingly, Plaintiff and the Class seek restoration of the monies of which they were unfairly and improperly deprived, as described herein, by way of transactions for the sale or purchase of US Treasuries entered into with Defendants or their co-conspirators.

## PRAYER FOR RELIEF

Plaintiff demands relief as follows:

A.    That the Court certify this lawsuit as a class action under Rules 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure, that Plaintiff is designated as a class representative, and that Plaintiff's counsel is appointed as Class counsel for the Class;

B.    That the unlawful conduct alleged herein be adjudged and decreed to violate Section 1 of the Sherman Act;

C.    That Defendants are permanently enjoined and restrained from continuing and maintaining the conspiracy alleged in the Complaint and that the Court direct such other equitable relief as may be appropriate;

      D.     That the Court award Plaintiff and the Class damages against Defendants for their violations of federal antitrust laws, in an amount to be trebled in accordance with such laws, plus interest;

      E.     That the Court find that Defendants violated the CEA and award appropriate damages;

      F.     That the Court award Plaintiff and the Class their costs of suit, including reasonable attorneys' fees and expenses, as provided by law; and

      G.     That the Court directs such further relief it may deem just and proper.

Dated: July 30, 2015

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
Jason A. Zweig (JZ-8107)
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone: (212) 856-7227
Fax: (917) 210-3980
jasonz@hbsslaw.ocm

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com

Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
455 W. Cityfront Plaza Drive, Suite 2410
Chicago, Illinois 60611
Telephone: 708-628-4949
Facsimile: 708-628-4950
beth@hbsslaw.com

Peter E. Borkon
Jeff Friedman
Shana E. Scarlett (217895)
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202

Berkeley, CA  94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
peterb@hbsslaw.com
jefff@hbsslaw.com
shanas@hbsslaw.com

*Attorneys for Plaintiff IBEW Local 640 Arizona*
*Chapter NECA Pension Trust Fund*

- 44 -